CASE NO. 13-1774

_____

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

_____

**EMILY KROLL**
*Plaintiff-Appellant*

**v.**

**WHITE LAKE AMBULANCE AUTHORITY**
*Defendant-Appellee,*

**On Appeal from the United States District Court
For the Western District of Michigan
Southern Division
Case No. 1:09-cv-626**

_____

**APPELLEE'S BRIEF ON APPEAL**

**\*\*\*ORAL ARGUMENT REQUESTED\*\*\***

<u>**CERTIFICATE OF COMPLIANCE**</u>

<u>**CERTIFICATE OF SERVICE**</u>

MICHAEL S. BOGREN (P34835)
PLUNKETT COONEY
950 Trade Centre Way, Suite 950
Kalamazoo, Michigan   49002
(269)226-8822

CASE NO. 13-1774

_____

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

_____

**EMILY KROLL**
*Plaintiff-Appellant*

**v.**

**WHITE LAKE AMBULANCE AUTHORITY**
*Defendant-Appellee,*

**On Appeal from the United States District Court
For the Western District of Michigan
Southern Division
Case No. 1:09-cv-626**

_____

## <u>CORPORATE DISCLOSURE</u>

Pursuant to Sixth Circuit Rule 26.1, Defendant-Appellee White Lake Ambulance Authority makes the following disclosures:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation? *No.*

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? *No.*

DATED:  October 3, 2013          PLUNKETT COONEY


BY:  s/Michael S. Bogren_____
       Michael S. Bogren (P34835)
Attorney for Defendant-Appellee

BUSINESS ADDRESS:
950 Trade Centre Way, Suite 310
Kalamazoo, MI  49002
**Direct Dial:  269/226-8822**

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE ........................................................................

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ........................................................ iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT .............................. 1

COUNTER-STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ........................................................................ 2

COUNTER-STATEMENT OF THE ISSUES FOR REVIEW ..................... 3

COUNTER-STATEMENT OF FACTS ........................................... 6

   A.  Plaintiff's Position at White Lake Ambulance Authority..................... 6

   B.  Plaintiff's Mental and Emotional State.................................. 6

   C.  Plaintiff's Work Place Behavior. .......................................... 8

   D.  Plaintiff Is Told She Needs Counseling............................... 12

COUNTER-STATEMENT OF THE STANDARD OF REVIEW.............. 16

SUMMARY OF THE ARGUMENT ............................................ 18

ARGUMENT I........................................................................... 21

       THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT WHERE THE COUNSELING AT ISSUE WAS JOB RELATED AND A BUSINESS NECESSITY. .................................................................... 21

A.  Overview ........................................................................... 21

B.  There Was Significant Evidence Known to WLAA Justifying
    the Order for Counseling and Plaintiff's Disciplinary History
    Was Irrelevant. ................................................................. 28

C.  Binns's Subjective Motivation Is Irrelevant. ...................... 47

D.  The District Court Did Not Draw Improper Inferences In Favor
    of the Defendant. .............................................................. 50

CONCLUSION ..................................................................... 53

CERTIFICATE OF COMPLIANCE............................................ 54

CERTIFICATE OF SERVICE .................................................. 56

APPELLEE'S DESIGNATION OF RECORD............................. 58

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

Bazzi v. City of Dearborn,
   658 F.3d 598, 604 (6th Cir. 2011)............................................................. 51

Bowling Green v. Martin Land Dev. Co., Inc.,
   561 F.3d 556, 558 (6th Cir.2009)............................................................. 16

Cody v. CIGNA Healthcare of St. Louis, Inc.,
   139 F.3d 595, 599 (8th Cir.1998)........................................................ 40, 43

Coffman v. Indianapolis Fire Dep't,
   578 F.3d 559, 565-566 (7th Cir. 2009) ........................................ 45, 46, 47

Conroy v. New York State Dep't of Corr. Servs.,
   333 F.3d 88, 98 (2d Cir. 2003)................................................................ 43

Crouch v. Honeywell Int'l, Inc.,
   720 F.3d 333, 338 (6th Cir. 2013)...................................................... 18, 54

Denman v. Davey Tree Expert Co.,
   266 F. App'x 377, 379 (6th Cir. 2007) .................................................... 31

E.E.O.C. v. Prevo's Family Market, Inc.,
   135 F.3d 1089 (6th Cir. 1998)......................................... 20, 25, 28, 32, 38

Fitzpatrick v. City of Atlanta,
   2 F.3d 1112, 1119 n. 6 (11th Cir.1993 ................................................... 50

Jibson v. Michigan Educ. Ass'n-NEA,
   30 F.3d 723, 729 (6th Cir. 1994)............................................................ 54

Lanman v. Johnson Cnty., Kansas,
   393 F.3d 1151, 1157 (10th Cir. 2004)..................................................... 43

Lee v. City of Columbus, Ohio,
   636 F.3d 245, 252 (6th Cir. 2011)........................................................... 23

Lorillard v. Pons,
    434 U.S. 575, 581, 98 S. Ct. 866, 55 L. Ed. 2d 40 (1978) ...................... 53

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) .................... 17

Meritor Savings Bank v. Vinson,
    477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) ......................... 28

Mickens v. Polk County School Board,
    430 F.Supp.2d 1265 (M.D.Fla.2006) ...................................................... 47

Miller v. Champaign Community Unit School District No. 4,
    983 F.Supp. 1201 (C.D.Ill.1997).................................................. 46, 48, 55

Moore v. Lafayette Life Ins. Co.,
    458 F.3d 416, 429 (6th Cir.2006) ........................................................... 16

Niemi v. NHK Spring Co., Ltd.,
    543 F.3d 294, 298 (6th Cir.2008) ........................................................... 17

Owusu-Ansah v. Coca-Cola Co.,
    715 F.3d 1306, 1313 (11th Cir. 2013) .................................................... 41

Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Michigan,
    722 F.3d 861, 865 (6th Cir. 2013) .......................................................... 17

Rosebrough v. Buckeye Valley High Sch.,
    690 F.3d 427, 433 (6th Cir. 2012) .......................................................... 54

Smith v. Honda of Am. Mfg., Inc.,
    101 F. App'x 20, 24-25 (6th Cir. 2004).................................................. 55

Standard Fire Ins. Co. v. Ford Motor Co.,
    723 F.3d 690, 692 (6th Cir. 2013).......................................................... 16

Sullivan v. River Valley Sch. Dist.,
    197 F.3d 804, 811-812 (6th Cir. 1999) ..................... 26, 27, 28, 33, 49, 50

Tice v. Centre Area Transp. Auth.,
  247 F.3d 506, 518 (3d Cir. 2001) ............................................................. 50

United States v. Mesa,
  62 F.3d 159, 162 (6th Cir.1995) ............................................................... 51

Van Wyhe v. Reisch,
  581 F.3d 639, 654 (8th Cir. 2009) ........................................................... 52

Villegas v. Metro. Gov't of Nashville,
  709 F.3d 563, 568 (6th Cir.2013) ............................................................ 16

Watson v. City of Miami Beach,
  177 F.3d 932 (11th Cir.1999) ........................................................... 40, 44

Whren v. United States,
  517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) .................... 52

## Statutes

29 C.F.R. § 1630.13(b) ................................................................................ 24
29 U.S.C. § 260 ........................................................................................... 49
42 U.S.C. § 12112(d)(4) ....................................... 4, 18, 21, 22, 23, 24, 26, 41
42 U.S.C. § 12112(d)(4)(A) ............................................. 4, 18, 21, 22, 26, 41
42 U.S.C. § 2000cc ...................................................................................... 49

## Constitutional Provisions

Fourth Amendment ...................................................................................... 48

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendant/Appellee, White Lake Ambulance Authority, requests this Court to docket this appeal for oral argument. Argument is particularly appropriate in this appeal because it involves relatively novel issues concerning the Americans with Disabilities Act.  Oral argument will afford the Court the opportunity to pose any questions it may have concerning the parties' respective positions. Defendant-Appellee's counsel believes that participation in oral argument will be beneficial, and that the decisional process will be significantly aided by the Court's grant of oral argument.

## COUNTER-STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The Defendant concurs in the Plaintiff's Jurisdictional Statement.

## <u>COUNTER-STATEMENT OF THE ISSUES FOR REVIEW</u>

**WHETHER THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT WHERE THE COUNSELING AT ISSUE WAS JOB RELATED AND A BUSINESS NECESSITY?**

The District Court answered "Yes."

The defendant/appellee answers "Yes."

The plaintiff/appellant answers "No."

## COUNTER-STATEMENT OF THE CASE

The Plaintiff filed suit against the Defendant for an alleged violation of the Americans with Disabilities Act (ADA).  Plaintiff alleged she was ordered to undergo a "medical examination" in the form of psychological counseling in violation of 42 U.S.C. § 12112(d)(4)(A).  The District Court originally granted defendant's motion for summary judgment, holding that psychological counseling was a not a medical examination under the ADA.  A panel of this Court reversed, with Judge Sutton dissenting, holding that the issue of whether the counseling was a medical examination must be decided by a jury. On remand the District Court again granted the defendant's motion for summary judgment, holding that if the counseling constituted a medical examination it was job related and a business necessity. Plaintiff again appeals the District Court's grant of summary judgment.

Plaintiff, Emily Kroll, is a former employee of the White Lake Ambulance Authority ("WLAA").  The WLAA is a municipal entity, formed by various municipalities north of the City of Muskegon, as an intra-governmental entity pursuant to Michigan statute.

The facts that were developed through discovery demonstrate Plaintiff has a long-standing history of emotional and behavioral problems.

4

Unfortunately, Plaintiff's emotional and behavioral problems affected how she interacted at work to the point that in April 2008, she was advised she needed to undergo counseling and/or therapy. Plaintiff refused to do so and turned in her keys and equipment. She and has not worked at WLAA since.

Assuming the counseling constituted a medical examination under the ADA, it was job related and a business necessity. Accordingly, Defendant WLAA was entitled to summary judgment. The District Court's decision was proper and should be affirmed by this Court.

## <u>COUNTER-STATEMENT OF FACTS</u>

**A.    Plaintiff's Position at White Lake Ambulance Authority.**

Plaintiff was hired at WLAA as an EMT Basic on October 22, 2003. As an EMT Basic, she traveled with a paramedic in a White Lake Ambulance vehicle to assist in the rendering of care to injured or ill individuals. She operated the ambulance while the paramedic provided assistance, care, and treatment to the patient en route to the hospital.

This case is not about whether plaintiff could perform the technical requirements of her job as an EMT. This case is about plaintiff's mental and emotional stability, the impact of plaintiff bringing her overwhelming personal issues into the WLAA workplace, and the potential impact it could have on WLAA employees, patients, equipment, and the public at large.

**B.    Plaintiff's Mental and Emotional State.**

Plaintiff's sister, Elizabeth Johnson, testified Plaintiff experienced sadness because she was not married, and expressed frustration with not being able to find the right man. (Motion for Summary Judgment, **RE 50-4**, E. Johnson Dep., Page ID# 264-265). Plaintiff repeatedly asked Jodi Osborn, at that time her friend, why she only attracted married men. (Motion for Summary Judgment, **RE 50-5**, J. Osborn Dep, Page ID# 276).

In 2007 plaintiff started an affair with Joshua Easton, another employee at the WLAA. Easton testified the sexual phase of the affair lasted upwards of 4 months. He described his relationship with plaintiff as "rocky," due to differences of opinion as to what form the relationship would take. (Motion for Summary Judgment, **RE 50-5**, J. Osborn Dep., Page ID# 281). Easton promised plaintiff he was going to get a divorce. He never carried through with his promise. (Motion for Summary Judgment, **RE 50-6**, J. Easton Dep., Page ID# 282). Plaintiff expressed concerns about why Easton wasn't getting divorced and showed jealousy towards him. (Motion for Summary Judgment, **RE 50-6**, J. Easton Dep., Page ID# 283-284). Easton testified he attempted to break off the relationship with plaintiff on several occasions. One of the occasions occurred when he became jealous because plaintiff was not focusing enough attention on him. (Motion for Summary Judgment, **RE 50-6**, J. Easton Dep., Page ID# 286-287).

During his deposition, Easton testified to an incident which occurred on Valentine's Day 2008, when he gave plaintiff roses, and found out that she had received roses from another man. Plaintiff testified she became depressed after Easton accused her of being with another man. Plaintiff identified Derrick Roesler as the other man from whom she received the

flowers.  This made Easton jealous, and prompted him to find out who gave plaintiff the roses.  (Motion for Summary Judgment, **RE 50-6**, J. Easton Dep., Page ID# 291).  Plaintiff testified when Easton became jealous, he checked the messages on her cell phone.  Easton was not satisfied with merely checking plaintiff's phone records.  He decided to hack into her e-mail account to read her e-mails.  (Motion for Summary Judgment, **RE 50-6**, J. Easton Dep., Page ID# 288).  This caused Plaintiff to break down and cry.  She yelled at Easton over hacking into her e-mail account.  (Motion for Summary Judgment, **RE 50-6**, J. Easton Dep., Page ID# 289-290).  Plaintiff testified after Easton found out she had received flowers from another man they got into a fight, in which plaintiff yelled at him.  (Motion for Summary Judgment, **RE 50-7**, Plaintiff Dep., Page ID# 297, 300).

### C.    Plaintiff's Work Place Behavior.

Numerous employees testified about plaintiff getting into verbal confrontations and yelling at fellow employees.  They characterized plaintiff's actions as bringing her personal life into the work place.  (Motion for Summary Judgment, **RE 50-5**, J. Osborn Dep., Page ID# 270-271; **RE 50-8,** J. Betka Dep., Page ID# 312-315).  Easton testified while he was working, plaintiff would send him text messages or e-mails, inquiring what he was doing.  (Motion for Summary Judgment, **RE 50-6**, J. Easton Dep.,

8

Page ID# 284).  He further testified plaintiff called him to scream and yell at him over the phone.  (Motion for Summary Judgment, **RE 50-6**, J. Easton Dep., Page ID# 285).  Mark Terpstra, a paramedic, testified plaintiff would on occasion talk to and argue with Easton on her cell phone while she operated an ambulance.  (Motion for Summary Judgment, **RE 50-9**, M. Terpstra Dep., Page ID# 318, 320, 323-324).  There is no question that Brian Binns, the WLAA Director, had banned employee cell phone usage while operating a WLAA vehicle.  (Motion for Summary Judgment, **RE 50-10**, Memo, Page ID# 328).  In his April 6, 2005 memo to WLAA staff, Binns clearly articulated the dangers associated with operating a vehicle while using a cell phone.

In addition to using a cell phone and arguing with Easton while she was operating an ambulance, plaintiff also used her cell phone to send text messages to Easton ***while operating the WLAA's ambulance***.  (Motion for Summary Judgment, **RE 50-6**, J. Easton Dep., Page ID# 284; **RE 50-5,** J. Osborn Dep., Page ID# 273-274; **RE 50-9,** M. Terpstra Dep., Page ID# 325-326).  Both Jodi Osborn and Mark Terpstra talked to plaintiff about their concerns regarding her arguing with Easton on the cell phone and texting while operating an ambulance.  Plaintiff did not respond to their concerns. The concerns of Mark Terpstra and Jodi Osborn pertaining to plaintiff's

actions while operating an ambulance were communicated to Jean Dresen and to Brian Binns.  (Motion for Summary Judgment, **RE 50-5**, J. Osborn Dep., Page ID# 269, 274-275; **RE 50-9,** M. Terpstra Dep., Page ID# 320, 322, 324).

During the spring of 2008, plaintiff developed a friendship with a fellow employee, Amy Callison.  Amy Callison prepared a written statement for WLAA, because she was concerned about plaintiff.  (Motion for Summary Judgment, **RE 50-11**, A. Callison Dep., Page ID# 331).  Callison testified she went to Binns to express her concerns about plaintiff's well-being.  During her deposition, Callison testified as follows:

Q   What did you tell Brian Binns in that occasion that you met with him?

A   *That I was concerned for her.  That she needed counseling.  And I even told Emily that she needed counseling*.  I think that would help her in the long run to go through, because she was an emotional wreck.

(Motion for Summary Judgment, **RE 50-11**, J. Callison Dep., Page ID# 332). (Emphasis added).

Amy Callison further testified in the spring of 2008 she felt that plaintiff was suicidal, that plaintiff was extremely emotional, and she did not

want plaintiff to hurt herself.  She reported these concerns to Binns.  (Motion for Summary Judgment, **RE 50-11**, J. Callison Dep., Page ID# 333).

Callison went to talk to Binns after she had talked to plaintiff about the need for counseling, and plaintiff refused.  (Motion for Summary Judgment, **RE 50-11**, J. Callison Dep., Page ID# 334).  Callison testified it got so bad that she finally had to request plaintiff to stop texting her.  Callison testified Plaintiff was texting her all the time, and Callison's phone bills were getting too high.  (Motion for Summary Judgment, **RE 50-11**, J. Callison Dep., Page ID# 336).  Callison further testified to an incident in which plaintiff followed her to a grocery store, parked next to Callison's vehicle, and when Callison got out of the store, plaintiff was in her car "bawling."  (Motion for Summary Judgment, **RE 50-11**, J. Callison Dep., Page ID# 334-335).

Callison further testified on several occasions plaintiff told her she "wanted to go into a big black hole and disappear."  Callison testified when plaintiff reported this to her, she finally decided she needed to go to Binns and tell him that something needed to be done, because plaintiff possibly was suicidal.  (Motion for Summary Judgment, **RE 50-11**, J. Callison Dep., Page ID# 336-337).

### D.    Plaintiff Is Told She Needs Counseling.

Jean Dresen was inundated with reports from fellow employees of concerns about plaintiff's emotional well-being. (Motion for Summary Judgment, **RE 50-12**, J. Dresen Dep., Page ID# 341, 344; **RE 50-13,** 6-25-08 Letter, Page ID# 351-353). Indeed, on one occasion, plaintiff called Dresen at night while plaintiff was on duty at WLAA. Plaintiff was crying. Dresen communicated this incident to Binns as well. (Motion for Summary Judgment, **RE 50-12**, J. Dresen Dep., Page ID# 340).

In response, Binns tried to verify with WLAA employees of their observations of plaintiff's emotional well-being. Plaintiff's good friend, Kathy Sturgis, testified Binns approached her in April, 2008, advised he had been receiving information from people that plaintiff was emotionally unstable, and solicited her opinion. Sturgis also heard that plaintiff had been reported to be using her cell phone and texting while operating an ambulance before plaintiff was requested to seek counseling. Binns also expressed his concern to Sturgis about the report of plaintiff using a cell phone or texting while operating an ambulance. (Motion for Summary Judgment, **RE 50-14**, K. Sturgis Dep., Page ID# 356, 358).

A week prior to April 28, 2008, Jean Dresen and Brian Binns talked about their mutual concerns with the behavior being manifested by plaintiff.

Binns directed Dresen to contact Hackley Work Place Health to see if they could find someone to assist Plaintiff. (Motion for Summary Judgment, **RE 50-12**, J. Dresen Dep., Page ID# 345-346; **RE 50-15,** B. Binns Dep., Page ID# 363). Accordingly, Dresen contacted plaintiff and told her about possible arrangements to receive therapy or counseling. Dresen requested plaintiff to sign a release so the WLAA could verify plaintiff was attending counseling. In 2007, plaintiff had agreed she needed some counseling and therapy at that time, and Dresen later found out that plaintiff had never attended and lied about having done so. (Motion for Summary Judgment, **RE 50-12**, J. Dresen Dep., Page ID# 347, 349).

The problems with plaintiff came to a head on April 28, 2008. Prior to that date, plaintiff had forwarded Jodi Osborn an e-mail that plaintiff previously had sent to Easton. In the e-mail, plaintiff inquired of Easton: "Have u done Jodi? Or anything sexually with her at all?" (Motion for Summary Judgment, **RE 50-16,** E-mail, Page ID# 368; **RE 50-7,** Plaintiff Dep., Page ID# 301-303). Plaintiff and Osborn got into an argument during an ambulance call about the e-mail. (Motion for Summary Judgment, **RE 50-7**, Page ID# 303; **RE 50-5,** J. Osborn Dep., Page ID# 268). During the argument between plaintiff and Osborn, they were in back of the ambulance administering care to a patient. Osborn, as the paramedic, requested that

plaintiff administer oxygen to the patient. Plaintiff failed to respond to this order. Plaintiff was right next to Osborn when she requested plaintiff to administer the oxygen to the patient, so there was no question plaintiff heard Osborn's directive. (Motion for Summary Judgment, **RE 50-5**, J. Osborn Dep., Page ID# 271-272). When she got back to the WLAA garage, Osborn told Binns about plaintiff's behavior on the ambulance run and plaintiff's failure to follow her request to administer oxygen to the patient. (Motion for Summary Judgment, **RE 50-5**, J. Osborn Dep., Page ID# 277-278).

Plaintiff and her father went to the ambulance garage around noon to talk to Binns. Prior to Binns talking to plaintiff, he talked to Kathie Sturgis about plaintiff's problems. Binns told Sturgis he was going to tell plaintiff she had to go to counseling and that plaintiff would be able to retain her job. (Motion for Summary Judgment, **RE 50-14**, K. Sturgis Dep., Page ID# 359-360).

When plaintiff and her father got to the WLAA, a discussion and argument ensued. Plaintiff was advised that she needed to go to the counseling or therapy, and that she would be able to retain her job. Plaintiff concedes that as of April 28, 2008, she had emotional problems which required treatment or therapy. She testified she needed the treatment or therapy because of "the abuse that I went through from Josh . . . and . . . the

14

abuse I went through working there with some of the people." (Motion for Summary Judgment, **RE 50-7**, Plaintiff Dep., Page ID# 304-305). Plaintiff further testified the treatment or counseling was not offered free of charge, and that if she had the funds to get the treatment or counseling she would have gone. (Motion for Summary Judgment, **RE 50-7**, Plaintiff Dep., Page ID# 306-307). In any event, plaintiff refused to seek any treatment or therapy, threw her equipment on Binns' desk and walked out. Plaintiff has not worked at the WLAA since.

## COUNTER-STATEMENT OF THE STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo, "'using the same Rule 56(c) standard as the district court.' *Bowling Green v. Martin Land Dev. Co., Inc.,* 561 F.3d 556, 558 (6th Cir.2009)." *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692 (6th Cir. 2013). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville,* 709 F.3d 563, 568 (6th Cir.2013) (internal quotation marks omitted). "We may affirm a grant of summary judgment 'on any basis supported by the record.' *Moore v. Lafayette Life Ins. Co.,* 458 F.3d 416, 429 (6th Cir.2006)." *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Michigan*, 722 F.3d 861, 865 (6th Cir. 2013).

Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the non-movant must do more than simply show there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The dispute must present a *genuine* issue of *material* fact. "A dispute is 'genuine' only if

based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Niemi v. NHK Spring Co., Ltd.,* 543 F.3d 294, 298 (6th Cir.2008). A factual dispute concerns a 'material' fact only if its resolution might affect the outcome of the suit under the governing substantive law. *Id.* at 298–299." *Crouch v. Honeywell Int'l, Inc.*, 720 F.3d 333, 338 (6th Cir. 2013).

## SUMMARY OF THE ARGUMENT

The District Court correctly ruled that the defendant did not violate 42 U.S.C. § 12112(d)(4)(A), as it had a reasonable basis to request plaintiff to undergo the counseling. The District Court found the counseling was both job related and a business necessity. In reaching this conclusion the District Court relied on testimony of co-workers regarding plaintiff's behavior and concerns about her mental well-being.

The ADA allows medical examinations when they are job related and consistent with business necessity. The interpretative guidelines to the ADA explain that the statute was intended to prevent against 'medical tests and inquiries that do not serve a legitimate business purpose. This is consistent with the overall intent of the ADA, which is to prohibit employers (and others) from making decisions based on disabilities or stereotyped beliefs about disabilities without considering whether there is an actual impact on the ability to perform the essential functions of a given job.

Health problems, including mental health issues, that significantly affect an employee's performance of essential job functions justify ordering a physical examination. Contrary to plaintiff's argument there is no requirement that an employer conduct a mini-trial on each allegation regarding the plaintiff's mental state that is brought to its attention to

determine its accuracy or the context in which it occurred. The law, in fact, is to the contrary. The standard is not whether the employer has irrefutable proof that plaintiff cannot perform the essential functions of her job or that she poses a danger to herself or others. If that were the case, there would be no need for an examination. Indeed, the standard is not whether the plaintiff agrees with the information or there has been a hearing to determine whether the information is more likely than not accurate. Rather, the standard is whether the employer has reliable information to support the decision. The presence or absence of a disciplinary history is simply not relevant to a determination of job relatedness or business necessity.

The E.E.O.C. guidelines provide that an employer may require an examination based on reliable information it has received from a credible third party that an employee has a medical condition that may effect the ability to perform the essential job functions. WLAA had significant evidence from reliable third parties that plaintiff's behavior gave rise to a legitimate question of whether she could perform her job duties and whether she posed a risk of harm to herself or others.

The generally applicable standard from numerous cases that have addressed the issue of examinations is this: An employer can require an examination of an employee who holds a position that directly impacts the

public health, safety and welfare when the employer is made aware of information that the employee might not be able to perform the essential job functions or that the employee may pose a danger to herself or others.

In this case plaintiff never submitted to the counseling. In the absence of doing so plaintiff cannot establish a genuine issue of material fact as to whether the counseling was related to her job. Such a result is not only logical but required. Plaintiff cannot claim summary judgment was inappropriate based on a genuine issue of material fact when no one will ever know the answer to the "factual dispute." Plaintiff cannot argue the counseling was not job related when she does not know what it entailed. The answer to the question will never be known because *plaintiff never attended the counseling*. Plaintiff cannot now defeat a motion for summary judgment by arguing the counseling she never attended was not job related. On that basis alone the defendant was entitled to summary judgment.

 Binns's personal motivation in requiring counseling is irrelevant. The ADA's requirement that an examination be job related and consistent with business necessity is an objective one.

Plaintiff's argument that the District Court improperly drew inferences in favor of the defendant in granting the motion for summary judgment is not supported by the record or by law.

Essentially plaintiff argues that because Brian Binns testified at his deposition that he only remembered certain issues that were reported to him, or that he did not have a memory of other matters testified to by plaintiff's co-workers, the District Court committed reversible error in citing the testimony of the co-workers. This Court is required to conduct a de novo review of the ***entire record*** in a summary judgment case. The Court is not allowed to ignore record evidence that is relevant to the issues.

## <u>ARGUMENT I</u>

THE DISTRICT COURT PROPERLY GRANTED
SUMMARY JUDGMENT WHERE THE COUNSELING AT
ISSUE WAS JOB RELATED AND A BUSINESS
NECESSITY.

### A.    Overview

42 U.S.C. § 12112(d)(4)(A) provides:  "A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."  Plaintiff does not allege she was a qualified individual with a disability under the Act. Rather, she claims WLAA violated 42 U.S.C. § 12112(d)(4)(A) when she was told to undergo counseling. In *Lee v. City of Columbus, Ohio*, 636 F.3d

245, 252 (6th Cir. 2011), this Court held: "A plaintiff need not prove that he or she has a disability in order to contest an allegedly improper medical inquiry under 42 U.S.C. § 12112(d)." The District Court applied the holding from *Lee v. City of Columbus* to the instant case, which is not an improper medical inquiry claim, but is still a claim brought under subsection (d). The defendant does not disagree with the District Court's conclusion that plaintiff does not have to be a qualified individual with a disability to assert a violation of subsection (d)(4)(A).

The District Court ruled that the defendant did not violate 42 U.S.C. § 12112(d)(4)(A), as it had a reasonable basis to request plaintiff to undergo the counseling. The District Court found the counseling was both job related and a business necessity. In reaching this conclusion the District Court relied on testimony of co-workers regarding plaintiff's behavior and concerns about her mental well-being.

42 U.S.C. § 12112(a) provides: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(d) explicitly addresses medical examinations and inquiries. § 12112(d)(1) provides that the

"prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries." Thus, it is a violation of the ADA for an employer to utilize medical examinations or medical inquiries to discriminate on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(d)(4) identifies prohibited and acceptable medical examinations and inquiries. § 12112(d)(4)(A) defines prohibited examinations and inquiries:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, ***unless such examination or inquiry is shown to be job-related and consistent with business necessity***.

(Emphasis added). § 12112(d)(4)(B) defines acceptable examinations and inquiries:

> A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

The Code of Federal Regulations reiterates that a medical examination of a current employee is prohibited unless the examination is job related and consistent with business necessity. 29 C.F.R. § 1630.13(b) states:

> Except as permitted by § 1630.14, it is unlawful for a covered entity to require a medical examination of an employee or to make inquiries as to whether an employee is an individual with a disability or as to the nature or severity of such disability.

29 C.F.R. § 1630.14 states:

> Examination of employees. A covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity.

This Court has provided some guidance in evaluating claims under 42 U.S.C. § 12112(d)(4). In *E.E.O.C. v. Prevo's Family Market, Inc.,* 135 F.3d 1089 (6th Cir. 1998), the Sixth Circuit acknowledged that the ADA allows medical examinations only in certain limited circumstances. "The focus is on the nature of job relatedness and what constitutes a business necessity. The interpretative guidelines to the ADA explain that the statute was intended to prevent against 'medical tests and inquiries that do not serve a legitimate business purpose.'" *Id*. at 1094. This is consistent with the overall intent of the ADA, which is to prohibit employers (and others) from making decisions based on disabilities or stereotyped beliefs about disabilities without considering whether there is an actual impact on the ability to perform the

essential functions of a given job. While subsection (d)(4) applies to both disabled and non-disabled employees, it does so in the context of prohibiting medical examinations that inquire into the nature or severity of disabilities rather than an employee's ability to perform essential job functions. "Hence, according to the interpretation in Equal Employment Opportunity Commission regulations, any examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill the essential functions of the job. *See* 29 C.F.R. Part 1630, App. § 1630.14(c) (offering interpretive guidance to § 1630.14(c))." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811-812 (6th Cir. 1999).

In *Sullivan v. River Valley Sch. Dist.,* this Court addressed a similar although not identical claim to the one presented in this case. Mr. Sullivan was a teacher who began to exhibit "strange" behavior, including acting in a disruptive manner at a school board meeting, improperly disclosing a student's grade history to a local newspaper and criticizing a group sponsor in language deemed "inappropriate" by the school district. *Id*. at 808-809. The actual claim asserted by Sullivan was not a claim that the school district violated subsection (d)(4)(A). Rather, Sullivan alleged that he was subjected to adverse employment action due to being perceived as disabled. Specifically, Sullivan alleged that being required to undergo mental and

physical "fitness for duty examinations" violated the ADA as it demonstrated the school district perceived him to be disabled. The Sixth Circuit, in addressing Sullivan's concern that allowing the school district to conduct a mental examination would open the door for employers to conduct arbitrary psychological examinations of employees, observed that under 42 U.S.C. § 12112(d)(4)(A), post-hiring demands for examinations could only be made where shown to be "job-related and consistent with business necessity." *Id.* at 811.

In concluding the mental examination was appropriate, the *Sullivan* court held:

> While it is true that the ADA limits an employer's ability to request unfounded examinations to prevent "the unwanted exposure of the employee's disability and the stigma it may carry," an employer may order a well-founded examination. *EEOC v. Prevo's Family Market, Inc.,* 135 F.3d 1089, 1094 n. 8 (6th Cir.1998). As the district court held, health problems that significantly affect an employee's performance of essential job functions justify ordering a physical examination "even if the examination might disclose whether the employee is disabled or the extent of any disability." (Dist. Ct. Op. at 15, *quoting Yin v. State of California,* 95 F.3d 864, 868 (9th Cir.1996)). The same is true for ordering a mental examination when aberrant behavior similarly affects an employee's job performance.

*Id.* at 812.

26

E.E.O.C. guidance statements shed additional light on when medical examinations are permissible. "While not controlling authority, this administrative interpretation does represent 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d at 812. Under the E.E.O.C.'s guidance statements, a medical examination of an employee is "job-related and consistent with business necessity" when an employer "has a reasonable belief, based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition." E.E.O.C., Enforcement Guidance: Disability Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act, 2 EEOC Compl. Man. (CCH) P6910 (2000), available at: www.eeoc.gov/policy/docs/guidance-inquiries.html

The District Court held that both of these criteria had been met, although either alone would have sufficed. (Opinion, **RE 78**, Page ID# 812-814). On appeal plaintiff argues the District Court erred in granting defendant's motion for summary judgment. The plaintiff's arguments are:

- There was insufficient information to order the counseling and the plaintiff had no disciplinary history prior to being ordered to undergo counseling;

- The trial court did not consider Binns's subjective motivation for instructing plaintiff to undergo counseling;

- The trial court drew impermissible inferences in favor of defendant when it found that Binns relied on first hand reports from other employees regarding plaintiff's behavior.

The plaintiff's arguments are not supported by the record in this case or by the legal authorities addressing claims brought under subsection (d)(4)(A). The District Court's ruling should be affirmed.

### B.     There Was Significant Evidence Known to WLAA Justifying the Order for Counseling and Plaintiff's Disciplinary History Was Irrelevant.

Plaintiff first argues she had no disciplinary history prior to being instructed to undergo counseling, and was not disciplined for any of the events cited as the basis for the counseling. She similarly argues that she has denied some of the events even occurred. Thus, according to plaintiff's argument, the trial court could not grant summary judgment because there were factual disputes as to whether the counseling was job related or a business necessity. Plaintiff's argument misperceives the standard for

finding job relatedness and business necessity. Contrary to plaintiff's

argument there is no requirement that an employer conduct a mini-trial on

each allegation brought to its attention to determine its accuracy or the

context in which it occurred. The law, in fact, is to the contrary.

> An employer's request for a medical examination is job-related and consistent with business necessity when: (1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others. *See*);; *E.E.O. C. v. Prevo's Family Market, Inc.,* 135 F.3d 1089, 1095 (6th Cir.1998), (" '[t]he determination that an individual poses a "direct threat" ... shall be based on a reasonable medical judgment' " (quoting 29 C.F.R. § 1630.2(r))). *See also* http://www.eeoc.gov/policy/docs/guidance-inquiries.html.

*Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007). In

this case, there was no request for an accommodation so the first criterion is

inapplicable. The counseling request would be compliant with the ADA if

the plaintiff's ability to perform the essential functions of the job was

brought into question *or* if there was reason for WLAA to believe that

plaintiff posed a direct threat to herself or others.

The standard is not whether the employer has irrefutable proof that

plaintiff cannot perform the essential functions of her job or that she poses a

danger to herself or others. If that were the case, there would be no need for

an examination. Indeed, the standard is not whether the plaintiff agrees with

the information or there has been a hearing to determine whether the information is more likely than not accurate. Rather, the standard is whether the employer has reliable information to support the decision. The presence or absence of a disciplinary history is simply not relevant to a determination of job relatedness or business necessity.

The E.E.O.C. has addressed this precise issue in its Guidance Inquiries. It has stated: "An employer also may be given *reliable information* by a credible third party that an employee has a medical condition, or the employer may observe symptoms indicating that an employee may have a medical condition that will impair his/her ability to perform essential job functions or will pose a direct threat. In these situations, it may be job-related and consistent with business necessity for an employer to make disability-related inquiries or require a medical examination." www.eeoc.gov/policy/docs/guidance-inquiries.html

The Guidance Inquiries pose the following question and answer:

6. May an employer make disability-related inquiries or require a medical examination of an employee **based, in whole or in part, on information learned from another person**?

**Yes**, if the information learned is **reliable** and would give rise to a reasonable belief that the employee's ability to perform essential job functions will be impaired by a medical condition or that s/he will pose a direct threat due to a medical condition, an employer may make

30

disability-related inquiries or require a medical examination.

Factors that an employer might consider in assessing whether information learned from another person is sufficient to justify asking disability-related questions or requiring a medical examination of an employee include: (1) the relationship of the person providing the information to the employee about whom it is being provided; (2) the seriousness of the medical condition at issue; (3) the possible motivation of the person providing the information; (4) how the person learned the information (<u>e.g.</u>, directly from the employee whose medical condition is in question or from someone else); and (5) other evidence that the employer has that bears on the reliability of the information provided.

*Id*. (Emphasis added).

Plaintiff argues there was insufficient evidence to allow WLAA to order her to undergo counseling, citing the standard from *Sullivan*. "[F]or an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Sullivan,* 197 F.3d at 811. While the court did use the term "significant," that is not a particularly high threshold when the rest of the court's description of the standard is considered: "An employee's behavior cannot be ***merely annoying or inefficient to justify an examination***; rather, there must be ***genuine reason*** to doubt whether that employee can "perform job-related functions." *Id*. (Emphasis added).

Here are the facts known to WLAA[1] at the time plaintiff was directed to undergo counseling:

- Mark Terpstra, a paramedic, testified plaintiff would on occasion talk to and argue with Easton on her cell phone while she operated an ambulance. (Motion for Summary Judgment, **RE 50-9**, M. Terpstra Dep., Page ID# 318, 320, 323-324). There is no question that Brian Binns, the WLAA Director, had banned employee cell phone usage while operating a WLAA vehicle. (Motion for Summary Judgment, **RE 50-10**, Memo, Page ID# 328). In his April 6, 2005 memo to WLAA staff, Binns clearly articulated the dangers associated with operating a vehicle while using a cell phone.

- In addition to using a cell phone and arguing with Easton while she was operating an ambulance, plaintiff also used her cell phone to send text messages to Easton **while operating the WLAA's ambulance**. (Motion for Summary Judgment,

_____

[1] Plaintiff consistently refers to her belief about what Brian Binns did or didn't know. This is not the appropriate focus. Binns consulted with Jean Dressen about plaintiff. Dressen is the one who originally arranged for counseling. The facts known to Dressen are just as relevant as the facts known to Binns.

**RE 50-6,** Page ID# 284, **RE 50-5,** J. Osborn Dep., Page ID# 273-274; **RE 50-9,** M. Terpstra Dep., Page ID# 325-326).

- Both Jodi Osborn and Mark Terpstra talked to plaintiff about their concerns regarding her arguing with Easton on the cell phone and texting while operating an ambulance.  Plaintiff did not respond to their concerns.  The concerns of Mark Terpstra and Jodi Osborn pertaining to plaintiff's actions while operating an ambulance were communicated to Jean Dresen and to Brian Binns.( Motion for Summary Judgment, **RE 50-5**, J. Osborn Dep., Page ID# 269, 274-275; **RE 50-9,** M. Terpstra Dep., Page ID# 320, 322, 324).

- Amy Callison prepared a written statement for WLAA, because she was concerned about plaintiff.  (Motion for Summary Judgment, **RE 50-11**, A. Callison Dep., Page ID# 331).  Callison testified she went to Binns to express her concerns about plaintiff's well-being.  During her deposition, Callison testified as follows:

Q    What did you tell Brian Binns in that occasion that you met with him?

33

A   ***That I was concerned for her.  That she needed***
***counseling.  And I even told Emily that she needed***
***counseling***.  I think that would help her in the long run
to go through, because she was an emotional wreck.

(Motion for Summary Judgment, **RE 50-11**, A. Callison Dep.,
Page ID# 332). (Emphasis added).

- Amy Callison, a friend of plaintiff, testified that in the spring
  of 2008 she felt plaintiff was suicidal, that plaintiff was
  extremely emotional, and she did not want plaintiff to hurt
  herself.  Callison reported these concerns to Binns.  (Motion
  for Summary Judgment, **RE 50-11**, A. Callison Dep., Page
  ID# 333).  Callison went to talk to Binns after she had talked
  to plaintiff about the need for counseling, and plaintiff
  refused.  (Motion for Summary Judgment, **RE 50-11**, A.
  Callison Dep., Page ID# 334). Callison further testified to an
  incident in which plaintiff followed her to a grocery store,
  parked next to Callison's vehicle, and when Callison got out
  of the store, plaintiff was in her car "bawling."  (Motion for
  Summary Judgment, **RE 50-11**, A. Callison Dep., Page ID#
  334-335).  Callison further testified on several occasions

plaintiff told her she "wanted to go into a big black hole and disappear." Callison testified when plaintiff reported this to her, she decided she needed to go to Binns and tell him that something needed to be done, because plaintiff possibly was suicidal. (Motion for Summary Judgment, **RE 50-11**, A. Callison Dep., Page ID# 336-337).

- Jean Dresen was inundated with reports from fellow employees of concerns about plaintiff's emotional well-being. (Motion for Summary Judgment, **RE 50-12**, J. Dresen Dep., Page ID# 341, 344; **RE 50-13,** 6-25-08 Letter, Page ID# 351-353). On one occasion, plaintiff called Dresen at night while plaintiff was on duty at WLAA. Plaintiff was crying. Dresen communicated this incident to Binns as well. (Motion for Summary Judgment, **RE 50-12**, J. Dresen Dep., Page ID# 340).

- Plaintiff's good friend, Kathy Sturgis, testified Binns approached her in April, 2008, advised he had been receiving information from people that plaintiff was emotionally unstable, and solicited her opinion. Sturgis also heard that plaintiff had been reported to be using her cell phone and

texting while operating an ambulance before plaintiff was requested to seek counseling. Binns also expressed his concern to Sturgis about the report of plaintiff using a cell phone or texting while operating an ambulance. (Motion for Summary Judgment, **RE 50-14**, K. Sturgis Dep., Page ID# 356, 358).

- A week prior to April 28, 2008, Jean Dresen and Brian Binns talked about their mutual concerns with the behavior being manifested by plaintiff. Binns directed Dresen to contact Hackley Work Place Health to see if they could find someone to assist Plaintiff. (Motion for Summary Judgment, **RE 50-12**, J. Dresen Dep., Page ID# 345-346; **RE 50-15,** B. Binns Dep., Page ID# 363).

Applying the factors identified by the E.E.O.C. and the decisions of this Court, the District Court properly granted summary judgment to the defendant.

The first factor is the relationship of the person providing the information to the employee about whom it is being provided. The information provided to Dresen and Binns was from a variety of individuals, including plaintiff's friends, Amy Callison and Kathy Sturgis.

The second factor is the seriousness of the condition at issue. Given the disruptive nature of plaintiff's behavior and, more significantly, the fact that her friends thought she was suicidal, the seriousness was extreme.

The third factor is the possible motivation of the person providing the information. Since all of the information received by Dresen and Binns was consistent and two of the primary sources were plaintiff's friends Callison and Sturgis, there was no basis for WLAA to believe that the source of the information was unreliable or motivated by any animus toward plaintiff.

The fourth factor is how the person learned the information (e.g., directly from the employee whose medical condition is in question or from someone else). Here, all of the information given to Dresen and Binns was either observed by the individuals providing the information or was attributable to the plaintiff herself.

The fifth factor is other evidence that the employer has that bears on the reliability of the information provided. There is nothing in the record that would suggest the information provided to WLAA was in any way unreliable.

The decisions of other courts under similar circumstances lead to the conclusion the District Court properly granted summary judgment. Here, plaintiff was an EMT who assisted paramedics in providing emergency

medical care to those in emergent situations. Plaintiff was in a similar position to a police officer, firefighter or similar professional whose decisions and actions have a direct impact on the health and well-being of others. As other courts have made clear, WLAA was not obligated to wait for the plaintiff to engage in behavior that resulted in injury or death to someone before they could take action.

In *Watson v. City of Miami Beach,* 177 F.3d 932 (11th Cir.1999), the Eleventh Circuit considered the legality of a Fitness For Duty Examination under the ADA for a police officer who displayed "unusually defensive and antagonistic behavior towards his co-workers and supervisors," but whose job performance was otherwise satisfactory. *Id.* at 934. Recognizing that "[p]olice departments place armed officers in positions where they can do tremendous harm if they act irrationally," the court held that the ADA does not "require a police department to forego a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries." *Id.* at 935.

Similarly, in *Cody v. CIGNA Healthcare of St. Louis, Inc.,* 139 F.3d 595, 599 (8th Cir.1998) the Eighth Circuit held: "Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims....". The court further observed that

employers need to be able to use reasonable means to ascertain the cause of troubling behavior in their employees without exposing themselves to ADA claims under §§ 12112(a) and 12102(2)(C). *Id.*

In *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1313 (11th Cir. 2013), the Eleventh Circuit undertook an extensive discussion on the propriety of an employer requiring an employee to undergo a psychiatric/psychological fitness-for-duty evaluation. The court held that, given the information it had about plaintiff at the time, Coca–Cola did not violate § 12112(d)(4)(A) by requiring him to undergo an evaluation, as it was "job-related and consistent with business necessity."

The Eleventh Circuit determined the evaluation was "job-related" because an employee's ability to handle reasonably necessary stress in the workplace and work reasonably well with others were both essential functions of any position. Although plaintiff actually worked from his home, the court found the employer had sufficient information to require an examination because plaintiff's supervisor reported that plaintiff—in the course of complaining about discrimination and harassment—banged his fist on the table and said in a raised voice that someone was "going to pay for this." When he was deposed, plaintiff denied having behaved that way during his meeting with his supervisor, and he now points out that there

were no prior incidents showing that he had a propensity for workplace violence. "That, however, is not dispositive." *Id*. at 1311.

"On this record, we conclude that Coca–Cola had a reasonable, objective concern about Mr. Owusu–Ansah's mental state, which affected job performance and potentially threatened the safety of its other employees." *Id*. at 1312. The court went on to hold that the evaluation was also consistent with business necessity. "Though it may not be one of the traditional canons of statutory construction, common sense is not irrelevant in construing statutes, and in our view an employer can lawfully require a psychiatric/psychological fitness-for-duty evaluation under § 12112(d)(4)(A) if it has information suggesting that an employee is unstable and may pose a danger to others." *Id*.

In *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 98 (2d Cir. 2003), the Second Circuit held that "courts will readily find a business necessity if an employer can demonstrate that a medical examination or inquiry is necessary to determine whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties."

The Tenth Circuit held in *Lanman v. Johnson Cnty., Kansas*, 393 F.3d 1151, 1157 (10th Cir. 2004), that the plaintiff was properly ordered to submit to an examination. "Ms. Lanman was a long-time employee with a good employment history who suddenly became involved in several troubling incidents affecting co-workers. As the Eighth Circuit noted, 'Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims....' *Cody*, 139 F.3d at 599. This is especially true in professions like law enforcement where employees are responsible for the care and safety of others."

*Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007), also recognized the necessity of an employer having flexibility in dealing with employees in positions that brings them in contact with the public.

> "Our review of the record convinces us the defendants' request for Thomas's FFD evaluation was 'job-related and consistent with business necessity.' *See* 42 U.S.C. § 12112(d)(4)(A). As a Juvenile Unit employee, Thomas interacted with the parents or guardians of troubled children, assisted Juvenile Unit detectives, and served in a back-up security capacity. Thomas previously communicated to the defendants her concerns regarding the Juvenile Unit's work situation and safety. Thereafter, Thomas visited the emergency room for an anxiety attack, a condition her primary care physician and psychologist attributed solely to "work-related stress and anxiety," and which necessitated a three-week leave of absence. During this time-period, Hargarten unsuccessfully attempted to ascertain the cause of Thomas's work-related stress. Thomas then proposed to return to her same position in an unchanged environment, despite her repeated refusal to articulate the basis

for her work-related stress. On these facts, KCPD had legitimate reasons (1) to doubt Thomas's capacity to perform her work duties without being overcome by stress and anxiety, (2) to take proactive steps to ensure the safety of the public, Thomas and other Juvenile Unit employees, and (3) to seek reliable attendance from Thomas, an employee within a small division requiring twenty-four-hour staffing.

In *Watson v. City of Miami Beach,* 177 F.3d 932, 935 (11th Cir.1999), the court held: "In any case where a fire department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity."

*Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565-566 (7th Cir. 2009), is also instructive. Coffman was a firefighter who was referred for a psychological examination. In affirming the grant of summary judgment to the employer the Seventh Circuit stated: "Coffman's well-being was essential not only to her safety but to the public at large; thus, the Department had a particularly compelling interest in assuring that she was both physically and mentally fit to perform her duties. Here, multiple firefighters had expressed concern that Coffman did not seem like herself. When Chief Radez referred Coffman for an evaluation, he reported that although Coffman had initially been outgoing, she had become guarded to the extent that he believed there was a possibility that she was suffering from paranoia." *Id*. at 565. The Seventh Circuit noted that internal

communications within the department "paint a consistent picture of genuine concern that Coffman's behavior was uncharacteristic and was adversely impacting her ability to perform her job. Although a psychological evaluation in response to 'withdrawn' and 'defensive' behavior might not be job-related in many vocations, ***we do not second-guess the propriety of such an evaluation for a firefighter***." *Id*. (Emphasis added). The court concluded: "The Department has an obligation to the public to ensure that its workforce is both mentally and physically capable of performing what is doubtless mentally and physically demanding work. This special work environment convinces us that the Department's decision to refer Coffman for the fitness for duty evaluations was job-related and consistent with business necessity." *Id*. at 566.

The district court's opinion in *Coffman*, which was affirmed by the Seventh Circuit, rejected the plaintiff's argument that the concerns raised by co-workers were insufficient to justify requiring a mental examination as those employees did not have sufficient social contact with plaintiff to form a reliable, objective opinion. The court held:

> "There is nothing in the record to suggest that the concerns expressed by Robinson, Black, and Rumple were insincere or motivated by an improper purpose. Thus, it was entirely reasonable for Miller, Radez, and Stovall, as commanding officers, to rely upon the reports of Robinson, Black, and Rumple in making their decision

to refer Plaintiff to a fitness for duty psychological
examination. Plaintiff's assertion that Robinson, Black,
and Rumple misunderstood Plaintiff's introverted
behavior for depression is beside the point. The fact
remains that Miller, Radez, and Stovall were faced with
reports which questioned Plaintiff's ability to perform the
essential functions of her job with the IFD. ***As officers of
the IFD are charged with the safety of IFD employees
and the public, they were bound to refer Plaintiff for a
fitness for duty examination***. Plaintiff's ADA claim
therefore fails as a matter of law.

*Coffman v. Indianapolis Fire Dep't*, 619 F. Supp. 2d 582, 594 (S.D.

Ind. 2008) *aff'd,* 578 F.3d 559 (7th Cir. 2009). (Emphasis added).

　　While plaintiff is correct that a decision regarding whether an

employee was properly referred for an examination is fact intensive, it does

not follow that the issue is inappropriate for summary judgment. To the

contrary, there are no genuine issues of material fact in this case. All of the

facts are known to the parties, to the District Court and to this Court. All of

the decisions discussed above are also fact intensive decisions. However,

those decisions allow one to glean generally applicable standards from these

fact intensive situations. The generally applicable standard from these cases

that applies to this case is this:

　　An employer can require an examination of an employee who holds a

position that directly impacts the public health, safety and welfare when the

employer is made aware of information that the employee might not be able

to perform the essential job functions or that the employee may pose a danger to herself or others.

Several district courts have reached similar conclusions. In *Mickens v. Polk County School Board,* 430 F.Supp.2d 1265 (M.D.Fla.2006), the court noted that an employer could subject itself to liability for negligent hiring or retention by turning a blind eye toward an employee's erratic behavior. *Id.* at 1280. The court held that, "[a]s a matter of law, a school board's psychological examination of an employee is both job-related and consistent with a business necessity if that employee exhibits even mild signs of paranoid or agitated behavior that causes the school administration to question the employee's ability to perform essential job duties." *Id.*

Similarly, in *Miller v. Champaign Community Unit School District No. 4,* 983 F.Supp. 1201 (C.D.Ill.1997), the court condoned a psychiatric examination of an elementary school custodian. Focusing on the employee's daily interactions with school-aged children, the court ruled that "a psychiatric examination is job-related and consistent with business necessity in any case where an elementary school employee exhibits paranoid or agitated behavior that causes the school administration to be concerned about the personal safety of those in contact with the employee." *Id.* at 1206-1207.

In this case Binns and Dresen were informed of concerns numerous employees had related to plaintiff's mental condition and her ability both to do her job and whether she posed a risk to herself or others. As discussed, the record demonstrates far more than a single incident that called into question plaintiff's mental stability and her ability to do her job. The District Court properly granted the defendant's motion for summary judgment.

The defendant also brings to the Court's attention the following language from the *Sullivan* case: "Since Sullivan never submitted to the examinations, he precluded himself from being able to establish a genuine issue of material fact as to whether the exams were related to his job, or were too broad in scope." *Sullivan v. River Valley Sch. Dist.*, *supra*, 197 F.3d at 812. So too in this case plaintiff never submitted to the counseling. In the absence of doing so plaintiff cannot establish a genuine issue of material fact as to whether the counseling was related to her job. Such a result is not only logical but required. Plaintiff cannot claim summary judgment was inappropriate based on a genuine issue of material fact when no one will ever know the answer to the "factual dispute." Plaintiff cannot argue the counseling was not job related when she does not know what it entailed. The answer to the question will never be known because ***plaintiff never attended the counseling***. Plaintiff cannot now defeat a motion for summary judgment

by arguing the counseling she never attended was not job related. On that basis alone the defendant was entitled to summary judgment.

### C.    Binns's Subjective Motivation Is Irrelevant.

Plaintiff argues that Binns's subjective motivation in ordering plaintiff to go to counseling was unrelated to plaintiff's job performance. Plaintiff then makes much of a claimed history of Binns demanding counseling for employees he thought were having sexual relations outside of marriage. (Appellant's Brief, p. 21). The simple response to plaintiff's argument is that Binns's personal motivation is irrelevant. The ADA's requirement that an examination be job related and consistent with business necessity is an objective one. In *Sullivan*, this Court held: "[T]here is no need to assess an employer's intent in ordering a fitness-for-duty examination. An employee's protection from harmful intent on an employer's part comes from the dual requirements that there be evidence sufficient for a reasonable person to doubt whether an employee is capable of performing the job, and that any examination be limited to determining an employee's ability to perform essential job functions." *Sullivan v. River Valley Sch. Dist.*, *supra*, 197 F.3d at 813. "ADA's requirement that an IME be consistent with business necessity is an objective one. *Cf. Fitzpatrick v. City of Atlanta,* 2 F.3d 1112,

1119 n. 6 (11th Cir.1993." *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001).

This objective standard is consistent with the objects of the ADA and consistent with similar federal claims. Even if an employer subjectively believes that sending an employee to an examination is appropriate, if it is not objectively appropriate the employer cannot avoid liability. In a Fourth Amendment claim the issue is one of objective reasonableness. If a police officer subjectively believes she is using an appropriate amount of force she is still subject to liability if objectively the use of force is excessive. On the other hand, as long as an officer has probable cause to make a traffic stop, his subjective motivation (he wanted to investigate possible drug offenses rather than a traffic violation) will not render the stop unconstitutional. See, *Bazzi v. City of Dearborn*, 658 F.3d 598, 604 (6th Cir. 2011) ("A traffic violation provides probable cause to justify a stop 'even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop.' *United States v. Mesa,* 62 F.3d 159, 162 (6th Cir.1995). Accordingly, '[w]hen a traffic stop is supported by probable cause, an officer's subjective intent' behind stopping the vehicle 'is irrelevant.' *Blair,* 524 F.3d at 748 (citing *Wren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996))."

The Religious Land Use and Institutionalized Persons Act (RLUIPA) also lacks a subjective element. "The institutionalized persons section of RLUIPA [42 U.S.C. § 2000cc] at issue in this suit (Section 3), does not unambiguously prohibit discrimination—it prohibits substantial burdens on religious exercise, ***without regard to discriminatory intent***." *Van Wyhe v. Reisch*, 581 F.3d 639, 654 (8th Cir. 2009). The same is true of both the ADEA. While wilful violations can result in additional liquidated damages penalties, liability does not require intent on the part of the employer. "Similarly, while incorporating into the ADEA the FLSA provisions authorizing awards of liquidated damages, Congress altered the circumstances under which such awards would be available in ADEA actions by mandating that such damages be awarded only where the violation of the ADEA is willful." *Lorillard v. Pons*, 434 U.S. 575, 581, 98 S. Ct. 866, 55 L. Ed. 2d 40 (1978). As the Court noted, Congress amended the original FLSA with the Portal-to-Portal Pay Act of 1947, which, *inter alia*, granted courts authority to deny or limit liquidated damages where the "employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of" the FLSA, § 11, 29 U.S.C. § 260." *Id*. at n. 8.

An objective standard is objective at all times. Whether it is in finding a violation or in finding no violation, it is the objective view that is determinative, not the subjective intent of any individual or party. Even if an employer desperately desired to violate one of these statutes, it could only do so by engaging in actions that, in fact, objectively violate the statute. A *desire* to violate the statute accompanied by actions that are objectively reasonable or proper under these statute will not result in liability.

### D.    The District Court Did Not Draw Improper Inferences In Favor of the Defendant.

Plaintiff finally argues the District Court improperly drew inferences in favor of the defendant in granting the motion for summary judgment. This argument is not supported by the record or by law.

Essentially plaintiff argues that because Brian Binns testified at his deposition that he only remembered certain issues that were reported to him, or that he did not have a memory of other matters testified to by plaintiff's co-workers, the District Court committed reversible error in citing the testimony of the co-workers. While the defendant agrees that the court is required to draw all inferences in favor of the non-moving party in deciding a motion for summary judgment, *Crouch v. Honeywell Int'l, Inc.*, 720 F.3d 333, 338 (6th Cir. 2013), that does not mean the court must ignore some

portion of the record. Indeed, this Court is required to conduct a de novo

review of the ***entire record*** in a summary judgment case. *Rosebrough v.*

*Buckeye Valley High Sch.*, 690 F.3d 427, 433 (6th Cir. 2012); *Jibson v.*

*Michigan Educ. Ass'n-NEA*, 30 F.3d 723, 729 (6th Cir. 1994). In fact,

at summary judgment,

> the judge may consider all 'evidence [favorable to the movant]
> that the jury is required to believe.' Wright & Miller, *supra,* §
> 2529, at 299. Such evidence includes 'uncontradicted and
> unimpeached evidence from disinterested witnesses,' but under
> some circumstances even the testimony of an 'interested
> witness ... must be believed.' Wright & Miller, *supra*, § 2527,
> at 287-88. In particular, '[t]he testimony of an employee of the
> [movant] must be taken as true when it disclosed no lack of
> candor, the witness was not impeached, his credibility was not
> questioned, and the accuracy of his testimony was not
> controverted by evidence, although if it were inaccurate it
> readily could have been shown to be so.' Wright & Miller,
> *supra*, § 2527, at 287 n. 9 (citing *Chesapeake & Ohio R.R. v.*
> *Martin,* 283 U.S. 209, 216, 51 S.Ct. 453, 75 L.Ed. 983 (1931)).
> Even the testimony of the moving party that 'is not contradicted
> by direct evidence, nor by any legitimate inferences from the
> evidence, and ... is not opposed to the probabilities, nor, in its
> nature, surprising or suspicious, [need not be] den[ied]
> conclusiveness.' *Chesapeake & Ohio R.R.,* 283 U.S. at 218.

*Smith v. Honda of Am. Mfg., Inc.*, 101 F. App'x 20, 24-25 (6th Cir. 2004).

Plaintiff completely ignores the testimony of the witnesses – including

plaintiff's friends – who testified under oath that they related concerns to

Binns about plaintiff's behavior. Whether Binns had a recollection of those

events two or three years after the fact does nothing to refute the testimony.

Moreover, plaintiff also completely ignores the testimony of Jean Dresen who testified to concerns plaintiff's co-workers brought to her. This Court must not ignore the record evidence plaintiff tries to dismiss. Indeed, this Court is required to consider that record evidence. The plaintiff's assertion that the District Court drew impermissible inferences in favor of the defendant is contrary to the record. The District Court's ruling should be affirmed.

## CONCLUSION

WHEREFORE, Defendant-Appellee, White Lake Ambulance

Authority, respectfully requests this Court affirm the judgment of the

District Court.

Respectfully submitted,

PLUNKETT COONEY

Dated: October 3, 2013          By:    s/Michael S. Bogren
                                MICHAEL S. BOGREN (P34835)
                                Attorneys for Defendant-Appellee
                                950 Trade Centre Way, Suite 310
                                Kalamazoo, MI 49002
                                (269) 226-8822
                                E-mail: mbogren@plunkettcooney.com

CASE NO. 13-1774

_____

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

_____

**EMILY KROLL**
*Plaintiff-Appellant*

**v.**

**WHITE LAKE AMBULANCE AUTHORITY**
*Defendant-Appellee,*

**On Appeal from the United States District Court
For the Western District of Michigan
Southern Division
Case No. 1:09-cv-626**

_____

<u>**CERTIFICATE OF COMPLIANCE**</u>

STATE OF MICHIGAN          )
                                          ) ss.
COUNTY OF KALAMAZOO  )

Michael S. Bogren, being first duly sworn, certifies and states the following:

1.    That he is a shareholder with the firm Plunkett Cooney, and he is the attorney in principal charge of the above-captioned cause for the purpose of preparing the attached brief on appeal of defendant-appellee;

2.    That the brief on appeal prepared by his office complies with the type-volume limitation;

3.    That Plunkett Cooney relies on the word count of their word processing system used to prepare the brief; and

4.    The word processing system counts the number of words in the brief as 10,441 and 1,027 lines of text.

PLUNKETT COONEY

BY:__s/Michael S. Bogren_____
      Michael S. Bogren (P34835)
      Attorney for Defendant-Appellee

BUSINESS ADDRESS:
950 Trade Centre Way, Suite 310
Kalamazoo, MI  49002
**Direct Dial:  269/226-8822**

CASE NO. 13-1774

_____

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

_____

**EMILY KROLL**
*Plaintiff-Appellant*

**v.**

**WHITE LAKE AMBULANCE AUTHORITY**
*Defendant-Appellee,*

**On Appeal from the United States District Court**
**For the Western District of Michigan**
**Southern Division**
**Case No. 1:09-cv-626**

_____

**CERTIFICATE OF SERVICE**

   Michael S. Bogren, Attorney in the firm of Plunkett Cooney, being

first duly sworn, deposes and says that on the 3rd day of October, 2013, he

caused a copy of this document to be served upon all parties of record, and

that such service was made electronically upon each counsel of record so

registered with the United States Court of Appeals for the Sixth Circuit, and

via U.S. mail to any counsel not registered to receive electronic copies from

the Court, by enclosing  same in a sealed envelope with first class postage

prepaid.

PLUNKETT COONEY

BY:   s/Michael S. Bogren
        Michael S. Bogren (P34835)
Attorney for Defendant-Appellee

BUSINESS ADDRESS:
950 Trade Centre Way, Suite 310
Kalamazoo, MI  49002
**Direct Dial:  269/226-8822**

CASE NO. 13-1774

_____

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

### EMILY KROLL
*Plaintiff-Appellant*

v.

### WHITE LAKE AMBULANCE AUTHORITY
*Defendant-Appellee,*

**On Appeal from the United States District Court
For the Western District of Michigan
Southern Division
Case No. 1:09-cv-626**

_____

## APPELLEE'S DESIGNATION OF RECORD

| Description of entry no. | Record Entry | Page ID # |
|---|---|---|
| E. Johnson Dep | 50-4 | 264-265 |
| J. Osborn Dep | 50-5 | 268-278 |
| J. Easton Dep | 50-6 | 281-291 |
| E. Kroll Dep | 50-7 | 297-307 |
| J. Betka Dep | 50-8 | 313-315 |

| **Description of entry no.** | **Record Entry** | **Page ID #** |
|---|---|---|
| | | |
| M. Terpstra Dep | 50-9 | 318-320, 322-326 |
| Memo | 50-10 | 328 |
| A. Callison Dep | 50-11 | 331-337 |
| J. Dresen Dep | 50-12 | 340-341, 344-347, 349 |
| 6-25-08 Letter | 50-13 | 351-353 |
| K. Sturgis Dep | 50-14 | 356, 358-360 |
| B. Binns Dep | 50-15 | 363 |
| E-mail | 50-16 | 368 |
| Opinion | 78 | 812-814 |

Open.00560.31775.13307163-1